at least in the first case. You know the Fifth Circuit almost as well as we do. And the first case is number 24-60371, Jones v. Harkins. And we'll hear from Mr. Wallace. How many times has this one been to the Fifth Circuit? Well, it may have pleased the court. One appeal was argued twice. The appeal before that was argued and then the governor had a mandamus petition. This is the fifth oral argument of this case. It's been pending eight years. So I barely have to tell you that I'm Mike Wallace. I represent eight current and former members of the Mississippi Legislature who have now been ordered for the third time to produce documents and a privilege log. Every time we've been here, the plaintiffs have challenged jurisdiction. The first two times this court decided it did have jurisdiction. Nothing new about this order. I think you have jurisdiction again. So I will proceed to the jurisdiction of the district court. And that issue is standing. Whether these new commissioners have standing to challenge SB 2162, which would reform the authority over the Jackson Airport. Lujan and this court and Barber said that the analysis begins with identifying the invasion of a legally protected interest. The interest spelled out in the complaint is the interest of Jackson citizens in managing their own airport. But the first time we were here in the Stallworth case, the court said that interest doesn't exist. They have no interest in managing the airport. What this court said is they have failed to demonstrate injury to a legally protected interest. So they lost twice. No interest, no injury. They went back and amended. They tried to allege an injury, but they have never done anything to amend the complaint as to what interest they are seeking. It still is a generalized interest concerning Jackson. Now, the last time we were here, the former members in their brief, four members in their brief, said the complaint should be read as alleging that the statute was adopted at least in part because of personal racial discrimination against them. There's no allegation that there's any personal discrimination against these new commissioners. Whether or not they would have third parties standing to assert the claims of the old commissioners doesn't need to be discussed because the in-bank court says the old commissioners don't have any interest. They left the board. It's moot. Whatever interest they ever had is gone. So in this case, the new plaintiffs have gone back essentially to the old interest in the brief, the letter and the complaint. The letter they filed two weeks ago says that the state passed SB 2162 because they did not want black people running the airport. They said those black people, including officials and citizens, are the targets of that discrimination. And they claim any black person injured as a result of that generalized discrimination has standing to sue. But that's contrary to Moore v. Bryant. Moore v. Bryant is the case where they allege that the Mississippi flag was maintained because of intentional discrimination against black people. And the plaintiff even claimed that the flag made him sick. He was individually injured by this generalized discrimination. Neither this court nor the district court took issue with that. They assumed he had an individual injury and they said it didn't matter because the interest was a generalized interest belonging to black people in Mississippi. And what this court said is, it is not the seriousness of the harm, but it's generality that determines standing. Generalized discrimination against all blacks in Mississippi or in Jackson is not enough of an interest to allow a federal court to adjudicate it. There has to be, according to Moore, differential governmental treatment of the particular plaintiff. Now, again, in the new letter filed two weeks ago, these new plaintiffs who were here for the first time do not say how SB 2162 treats them differently from anybody else. And they can't because it doesn't. SB 2162 on its face is non-discriminatory. It treats all of the old commissioners, black and white alike, exactly the same way. If we ever get a new board, all people, black and white alike, are going to be eligible for appointment to that board. There is no differential treatment, so there is no compensable injury, recognizable interest that can be enforced by these folks in federal court. Well, it's not an individual interest. What kind of interest is it? It's an institutional interest. And they pretty much admit there is an institutional interest here. They say at page 22 of their in-bank brief, a bill saying that the JMAA can no longer appoint the airport CEO would work in institutional injury. SB 2162 says that and a whole lot more. They can't appoint the CEO. They can't have any role in the control of the airport. That is being sent over to a new authority with a new board. But that's what an institutional injury looks like. The Raines case describes the consequences of that injury on the existing board. It says a diminution of legislative power in Congress is an institutional injury. We have the same thing here. We have a diminution of administrative power belonging to JMAA. And because all commissioners are damaged equally, they have no individual interest. They are asserting only the institutional interest. That's what Raines says. If you haven't been singled out for specially unfavorable treatment, you cannot challenge the act you're challenging. The Supreme Court looked at it in the same way. It says that institutional injury is a harm inflicted on the legislature itself, such that it necessarily impacts all members of that legislature in equal measure. That's what we have here. It's an injury to the JMAA. It affects all members of the board in equal measure. Under Raines and under Arizona, because there is equality of treatment among commissioners, there is only an institutional injury or personal injury that can be maintained. But even if they could come up with an interest that is deserving of protection in federal court, they haven't got much of an injury. It's highly questionable. Their new letter seems to admit that a federal per diem would not work a individual injury. And as they characterize a federal per diem, it is intended to approximate and serve as a reimbursement for anticipated expenses. Indeed, a per diem anywhere is given for the convenience of the government or in the private sector, the convenience of the employer. They don't want to waste their time running through all your lunch tickets so they give you a certain amount of money and they don't care whether you eat at McDonald's regalitwas. They say that's how the federal per diem works and it doesn't work an individual injury. But they say Mississippi per diem is different. Nothing in the statute says it's different. 61-313 simply says you get two kinds of payment. You get traveling expenses and you get a per diem. They don't go through a whole list of possible expenses and say which goes where. Where does your lunch money go? If your lunch money goes to the traveling expenses, then yes, you get separately paid for it. But if you're expected to pay your lunch money out of your per diem, you're exactly like the federal government and they admit that that's not an injury. I don't know how the Mississippi statute classifies lunch money, but more importantly, they don't either. They run the agency and nothing in their complaint backs up in any way, shape, or form their allegation that a Mississippi per diem is different from a federal per diem. It's their burden. They haven't discharged it. And finally, if there is an interest and if there is an injury, the Murphy case says you have to analyze standing in each claim separately. If they're missing their lunch money, they've got a damage claim, but they haven't filed a damage claim. All they want is an injunction. And there isn't a case anywhere that says the fact that you have a damage claim means you're entitled to an injunction. They say exactly the opposite. If you can get a remedy in damages, you can't get an injunction. All they want is an injunction. They haven't specified any interest or any injury that will be addressed by that injunction. This case ought to be dismissed. If it's not, we get finally to issue of privilege that we've been fighting about long enough. Wait, wait, wait. What about Judge Ho's concurrence in our recent en banc? The way I looked at Judge Ho's concurrence is that, and again, this is in the letter I sent you two weeks ago, I think he overlooked the difference between damages and the injunctive relief they actually seek. In the four cases he cited, the court determined whether or not money could be available. Not a single person was restored or retained to office. The reason it's called Humphrey's executor is he's dead. Myers didn't get his postmastership back. Those were things that accrued while they were in their official capacity. While the lawsuit was going on, things accrued, and the Supreme Court adjudicated the money. But the Supreme Court never granted any injunctive relief, and this court should not grant injunctive relief, which is the only thing they're looking for. I will say a word about privilege in case we get there. In the long time we've been litigating this case, the Laotian case has been decided twice, and I think it pretty much settles everything. It recognizes that the two interests are confidentiality, like all privileges, and burden, which is peculiar to legislators. They have a lot to do, and this court in La Union protected them against it. The scope is anything related to the regular course of the legislative process. They've asked for anything related to SB 2162. They don't deny that's related to the legislative process. But they also asked for everything related to the airport, and they've said there may be documents relating to the airport that are not related to pending litigation. But they didn't read La Union properly, because La Union covers potential litigation as well as pending, I'm sorry, potential legislation as well as pending legislation. Anything a Mississippi legislator finds out about the airport is relevant to potential legislation and is therefore privileged. I don't say, again, before they get to the point of asking us to prepare a privilege log, which the Hubbard court didn't do, the North Dakota court didn't do, no court of appeals has done, they ought to be able to identify some document that might not be If it hasn't got anything to do, everything at the airport is relevant to potential legislation and therefore comes within the scope of the privilege. They also argue about waiver. They want to know everybody we've ever communicated with in writing to see if it constitutes a public dissemination of privileged material. But public dissemination is a much different concept than individual communications with individual people. And again, La Union, I think, recognized that. It says there are plenty of documents that may be shared with some third parties, that's plural, if they haven't been shared publicly. La Union doesn't define what public sharing is, but if you go back to where it comes from, it comes from the Rodriguez case in New York, where the legislators put Mike Carvin's legal opinion on the website. I have no idea why they did that, but it was a public dissemination. They wanted everybody to know it. The whole point of a public dissemination is that the legislators want people to know it. That's what Senator Gravel did in the Pentagon Papers case. He disseminated that because he wanted everybody to know about it. That's what a public dissemination looks like, not an individual communication to an individual constituent. So we don't think they ought to log every person they've ever talked to. That really would discourage communications with constituents, and that's a bad thing in the Republican form of government. Finally, there's no exception to the absolute privilege. This is not the kind of action like Gillick, which was a criminal action. Both La Union cases concede there might be exceptions on the civil side, but they go through a whole list of things that don't constitute that. An ordinary civil rights case, La Union's a voting rights case. All of these rights are important. This court in La Union, nevertheless, there was protection of the legislators, and the protection extends not just to litigation, but to answering questions. The whole point of a subpoena is civil process. They want you to answer questions. Tenney and La Union say they can't do that. The privilege should be upheld, and these subpoenas should not be enforced. All right. Thank you. You have an opportunity for rebuttal. Mr. Anderson. Good morning, Your Honors. Austin Anderson for the appellees, the commissioners. I'll start where Mr. Wallace did with standing. The distinction he's trying to draw between an interest and an injury has no basis in the complaint that we filed or in the briefings here. The commissioners have a legally protected interest in not losing their positions on the basis of race. That's exactly what our complaint says. Paragraph 140. This bill strips them of their positions on the basis of race. That's an equal protection injury. They're being treated differently because the state doesn't want black people running the airport. Well, let me ask you, doesn't that embed an assumption? These commissioners are appointed by the mayor and council of Jackson, right? Yes, they are. Is there some reason that the mayor and council of Jackson are always going to appoint blacks? No, there is no reason, but as the state anticipated— But in fact, they have already done so. So you're saying it's okay for them always to appoint blacks, but it's not okay for the legislature to make an across-the-board change in appointment processes? So, nobody has ever alleged a equal protection violation in the fact that the officials of Jackson have continued to appoint black people to the airport board, and our complaint also addresses this. Since 2016, as the state no doubt expected, the black officials in Jackson have continued to appoint black people. Those appointments reflect the racial makeup of the city. It's not surprising at all that the black— But Jackson is not 100 percent black. No, it is not, and there's no— It is not 100 percent black, and there is no allegation that the mayor or the city council has refused to consider white people for appointment to the board. There have been commissioners in the past. There's one right now, but the allegation of the complaint is that in 2015, when the black mayor and majority black city council appointed an all-black board, that black board hired a black CEO to replace the retiring white CEO. Then the state stepped in, singled out Jackson's airport, treated it differently from every other airport in the state, and said, we're going to take this airport away from the municipal authority and give it to a new authority. We also know that the public justification for the law was that mismanagement of the airport had led to Southwest Airlines deciding to stop offering service to Jackson. We expect to be able to show that that is not true, and so the one public reason that has been offered looks like pretext. The circumstances around the bill are very suspicious. That's why there's a racial discrimination at work in the bill, and that discrimination works against the black people who run the airport. The current commissioners are injured in exactly the same way as the commissioners who were serving in 2016 were. There's never been, we have never argued, we have never alleged that the bill is personally targeted at the individuals who happen to be serving in 2016. This bill doesn't say Evelyn Reed can't serve on the airport board. Well, then there is a disconnect because you're saying, are you not, that the legislature discriminated against blacks in the way it structured the law, but the individual commissioners are not discriminated against. Is that what you're saying? They are discriminated against because we're saying the state took the airport away because it was being run by black people. But all they said was that different groups are going to appoint commissioners, right? We know that the groups that are going to appoint the commissioners, a super majority of the new members will be appointed by the state and the surrounding counties, which are majority white, not the city of Jackson, which is majority white. Well, how do you know that, I mean, that's just rank speculation, isn't it, that this is going to end up with, does it have to be majority black commissioners in order to fulfill what your clients want? We are not, no. The point is that the fact that the state is taking the airport away from the black board and giving it to an authority that is now appointed by white people suggests that race was a motivating factor behind it. Wasn't the first board, the board that your clients are on, created by the state to begin with? I mean, is there anything that prevents the state from changing the arrangement of this airport or any other? I understand your argument that it was only this, it was only this airport, but what is the limitation on the state's authority to restructure the controlling authority of an airport or a utility or any other creature of state law? Just the equal, federal constitution. So in this case, the equal protection clause, but this is the Perry v. Sinderman case from the United States. But I thought you just said you're not making an equal protection argument. I mean, you're speculating that the new board would have appointments of, to the exclusion of black people in general, not to the exclusion of the current people who sit on the board, but to the exclusion of black people in general. That's the generalized grievance that your opponent talked about that is not permissible for standing, isn't it? It is not, your honor, because we have a particularized injury because these plaintiffs are the ones who will lose their seats when the law goes into effect. So the allegation is that the law is impermissibly race-based because it made this decision because this current authority is majority black and it wants an authority appointed by white people which presumably will be majority white. The state cannot use race as a justification like that. That is our allegation. The equal protection violation is that they are discriminating on the basis of race in making this change. So of course the state can reorganize municipal boards and reorganize state authorities, but as the Supreme Court said, although a state can take away a benefit or make a decision for any number of reasons, there are some reasons on which they cannot rely. The allegation here is that they were relying impermissibly on race when they made this decision to reorganize the board. And the black people who serve on the airport are injured by that decision. It's just like the student admissions cases. Tell me, before we, you mentioned the injury and I didn't want to interrupt you earlier when you initially started talking about standing, but how are they injured? I assume you agree that they're not entitled to a per diem or to a travel expense if they're not on airport business. I assume you agree with that. How are they injured otherwise? So we are, we still have a confusion about how this per diem works. The statute spells this out. You don't need to take my word for it or Mr. Wallace's word for it. The statute says this is compensation for service they're providing to the board. The statute also says they are separately reimbursed for their expenses. So when Mr. Wallace was saying about the state not wanting to have to sort through receipts, it's just not true. They get, they get their expenses back by submitting their receipts. They also get compensated for providing service. That's just like a wait. And if you lose a job... Wait, but it's not a salary. It's not a paid position, is it? I mean, the per diem is what you get when you are on a mission for a particular employer or a governmental entity. When you're an agent and you're conducting the business out of your agency, you're afforded a per diem to cover your expenses and your time while you're participating in your agency, correct? It's in exchange for the service you're providing to the board. So you don't have to be traveling. You don't have to be incurring expenses. If you drive to the airport and attend a meeting, if you log on from Zoom from your home to attend a meeting, you're entitled to that. But you have to be doing the meeting. You know, you have to, you can't just, on a day when you don't have business for the airport, you're not going to submit and receive a per diem payment, correct? And if you work... Is that correct? That is correct. Just like if you work an hourly wage job. If you don't show up to work, you don't get paid. Except for the fact the state is responsible for benefits, are they not, for their employees? I'll confess I'm not an employment lawyer. I don't know what the threshold is. Well, under the Garcia case, for instance, the state is responsible for overtime compensation. And the state is probably responsible for some sort of other benefits like health insurance or retirement pension fund or something like that for regular employees. These commissioners get none of that, right? That's true, but it does not change the fact that the compensation they receive is a benefit to them and is personal to them, just like a wage is personal. But there's still, but, you know, the city of Jackson could fire them and they wouldn't have a suit, right? As long as the city of Jackson did it for a permissible reason, yes. But that's, again, we're back to Perry. Well, not really, because what you're back to is the fact that you're in a volunteer position. And even though they give you some money, minimal amount, for being in a volunteer position, it's like employment at will at best. And if you lose your employment at will for a discriminatory reason. But whoever's the employer can change the terms, right? If they do so for a non-discriminatory reason. It's still an injury if you are injured by the loss of the benefits of your position. If the reason they fire you is permissible, then you don't have a cause of action and you can't sue. So here we have the injury, which is the loss of the benefits of their position. And we have the cause of action because the allegation is that this, they're stripped of their positions on the basis of race in violation of the Equal Protection Clause. Well, let me just ask you, how would we quantify these damages? I mean, are you suing for damages or are you suing for an injunction? We're suing for injunctive relief because this is a pre-enforcement suit. So this is the typical relief in a case bringing a constitutional challenge to a state law before it has been enacted. Susan B. Anthony lists the Dry House as the Supreme Court case that talks about this. This is exactly the same relief that they ask for. Susan B. Anthony didn't involve per diems. No. You have to have standing, and he's correct. Murthy very clearly says you have to have standing for each claim that you make. That's true. And our claim is that this law is unconstitutional. Do you know any other case that says you have standing to seek injunctive relief where your claim is a personal threat of a loss of a minimal amount of money? I believe that—no, Your Honor, but I'm not in the specific context of a per diem or the personal benefit of the position. But Supreme Court cases in Turner v. Fouch and Village of Arlington Heights both address standing as well. Those were challenges to actions that were allegedly race-based, and what the relief they were seeking was a reversal of the state action. That's what we're asking for here. We're saying this statute injures us and is unconstitutional. If you enjoin it—and that's the relief we've asked for. You want the district court to enjoin enforcement of the statute. If it doesn't go into effect, the JMA is not abolished, and these commissioners don't lose their positions. So the second argument that the legislators have raised is that commissioners are asserting an institutional argument. None of the cases about institutional injuries have ever held that losing your position in an institution is an institutional injury. This is what Judge Ho was talking about in his concurrence when he said this would be— No, because those were all people in employed positions. Powell v. McCormick was—what's his name?—Powell was elected to hold an office for which he got a salary, and Humphrey's executor, Humphrey, held a salary. They all held salaried positions. Those cases didn't turn on the fact that they were salaried positions. Salary was their injury in those cases, but we have an injury here. Because nobody would have doubted that. Right, but the—I'm sorry, my point is that the loss of your position is not personal solely because it is a salaried position. It is personal to you because you hold the position and you benefit from it. There are other cases—Turner v. Fouch, the Barton case in the First Circuit—that say losing a volunteer government position is an injury sufficient to support a constitutional claim. So we have an injury. This is a separate question of whether that injury is personal or— Let's say you're in a homeowners—let's say you're the president of a homeowners association, and the state of Mississippi decides to abolish all homeowners associations, which, for what it's worth, are highly regulated under Texas law because they're prone to abuses. So suppose they abolish those. Does every person in the homeowners association have a right to sue? It would depend on the benefits that they get from that position. The homeowners associations, I take it, are not government positions. They may be—well, they do. They regulate the amenities and the terms of service of a lot of public services to the people in a subdivision. I mean, you know, every state government has many, volunteer commissions, right? And they all get per diems and expenses in, think, minimal amounts, right? Yes. Well, presumably. So how does this implicate the ability, as Judge Engelhardt said, of a state to structure its governmental services? This is why it's important to have both Article III standing and a cause of action. If the state reorganizes a volunteer organization and does it for a permissible reason, there is no case there. Nobody can sue. If, however, the state takes that action in violation of the federal constitution, then Congress has said in Section 1983, the federal courts are open to you to try to vindicate your federal constitutional rights. So because we've alleged this decision was made in violation of the Equal Protection Clause, we are able to get into court. It does not mean that every reorganization of the administrative state will lead to a lawsuit. This rule isn't new. We're not asking the court to make any new law about—and recognizing that there is a—that people have an interest in their volunteer positions. That's—the Barton case in the First Circuit surveyed every other circuit to address the issue. They all agreed that it was an injury sufficient to support constitutional standing. We're not opening the floodgates here. There's no change to the law. The limiting factor is that you need a cause of action, and the courts are perfectly capable of kicking out frivolous claims on a motion to dismiss. That doesn't mean that we need—that we should close the courthouse doors completely to people because they are serving in an airport commission instead of in a salaried job. Well, what does it mean—what does it mean that we dismiss the prior—and this is probably a dumb question, but I'm not feeling my best. We dismiss the prior case for mootness because a couple of the commissioner's terms had run out. Yes, Your Honor, and so now the plaintiffs below reissued the subpoenas. They are the currently serving commissioners. Didn't that mean—yes, but didn't that mean that once you're no longer a commissioner, you no longer have standing? Once you're no longer a commissioner, your claim has become moot. They are similar but conceptually different concepts. The current commissioners have the same Article III standing as the original commissioners did. They have the identical injury. The causation and regressibility are exactly the same. So the Article III analysis— And really capable of repetition and evading review because here we are on the fifth oral argument. If you recall in January, I asked the court to overlook the mootness problem and decide the merits of this case for exactly that reason. So one additional—I'm sorry, I would like to address the privilege briefly if I can, Your Honors. There's a basic principle that should guide the decision here, and that is that the legislators do not get to decide the scope of their own privilege. La Union says that the privilege has a defined scope and it can be waived. Because those two things are true, not every document in the legislator's possession is privilege, and there are situations in which they might have to produce something. If that is true, it is the court and not the legislators who have to make that call, and so the district court's decision to require a privilege log was entirely appropriate. The scope is foundational to this privilege. It's—Judge Willard's opinion in La Union talks about it. It has to be within the sphere of legitimate legislative activity. The Supreme Court has said the same thing about the Speech and Debate Clause protections for federal lawmakers, which everybody agrees are broader than the state legislative privilege, and the Tenney case says it about legislative immunity. This is about protecting the integrity of the legislative process. There is no—it's not for the—I believe Tenney uses the phrase personal indulgence of the legislators. Your status as a legislator is not a get-out-of-jail-free card from all civil discovery. You have to—there has to be a relationship to the legislative process, and our subpoena on its face is broader than the legislative process. We give an example in our brief of an email that reveals that a legislator was aware that Southwest Airlines' decision to Jackson was not related to the airport's management. That in turn suggests that the publicly offered justification for the law was pretext and is circumstantial evidence of racial discrimination. You could have a communication before the bill was actually introduced talking about the airport's management, making comments about how it is being managed by the city. Mr. Wallace's definition of— How do you impute the—how do you impute offhand comments of individual legislators to the legislature as a body? I do not claim that it would be a smoking gun, but Village of Arlington Heights says that we have to look at the evidence available to try to make this showing, and that includes contemporary statements by the legislators. And the Supreme Court in Cooper v. Harris in 2017 applied that and relied on comments that legislators made to their colleagues about the purpose of a bill to try to show legislative intent. Village of Arlington Heights—excuse me—Village of Arlington Heights talks about a sensitive inquiry. That's exactly what we're trying to do here. I see that my time is up. If there are no further questions, I just ask that you affirm the district court and confirm that the legislators have to comply with Rule 45. Thank you very much. Okay, Mr. Wallace. May it please the court, I still haven't heard a distinction from Moore v. Bryant. He says the allegation in this case is this bill was passed because of intentional racial discrimination. That was the allegation in Moore v. Bryant, and Judge Reeves wrote one of his learned historical documents demonstrating that was true, but it still wasn't actionable. And the mere fact that these folks claimed to have been injured by 2162 is not enough. The plaintiff in Moore said it made him sick. And this court and the district court agreed it is still a generalized interest shared by all black people, and the fact that you have been injured by it doesn't make it actionable at your behest. What Moore does say is you have to show differential governmental treatment, but neither the current law or the new law treats people differently. Judge Jones, you asked about were all the current commissioners black. We asked this court during bank to take judicial notice of what was on their website. That's how we found out the last bunch of plaintiffs were gone. We also found out there's a white commissioner now. I don't know why he's not a plaintiff in this lawsuit, but he's not. Current law allows the appointing authorities to appoint black people, white people, Choctaws, whoever they want. The new bill allows the appointing to compete for a position of commissioner under the old law or under the new law. There is simply no differential treatment. So the fact that these people might lose their job is not differential treatment. It is simply the effect of the state's right to reorganize political subdivisions as they see fit. Again, he's up here arguing that it's discriminatory because the Jackson Airport is treated differently from all of the other airports. Under 2162, that may be the case, but that issue was resolved the first time we're here. It is all right for the state to discriminate between one city's airport and another city airport because there's no interest in your own right to examine, to operate the lawsuit. That issue has been out of the case for a whole long time. He keeps saying that there may be something out there that shows why Southwest left the airport. In eight years, they've never asked Southwest for that document. I don't understand why they should ask why it should happen here. It really doesn't have anything to do. It still, right or wrong, goes to potential legislation, and that's within the scope. The other thing I would say is that you don't always have to have a privilege log. Sometimes you do. In the first La Union case, there was a privilege log, and all the courts were able to talk about it, but there wasn't any privilege log in the second La Union case because they didn't know the documents were out there until this individual on his deposition says, yeah, I've got some communications on my personal text messages and emails. Now, nobody in that case thought you needed a privilege log. The district judge looked at it and said, I know what you're fighting about. You're entitled to get it. This court looked at it and said, I know what you're fighting about. You're not entitled to get it. And that's the same thing here. They're trying to see information that went into our decision, to the legislature's decision, to change the management of the airport. That's privilege. Arlington Heights doesn't anticipate you're going to be able to get that information. It specifically says you probably aren't. It says most of that is going to be privileged. Your Honor, again, this is a very strange case. It's not about lunch money. If it were about lunch money, they would ask for damages, but they haven't asked for damages. They don't care about lunch money. They care about millions of dollars of contracts and controlling the airport. That's what Judge Reeves said in one of his opinions, that this is about who gets to control the airport. That is a decision for the state to make. It is not a decision to be hashed out under the pretense of protecting somebody's lunch money. They're not entitled to an injunction. Nobody's ever gotten one, and this shouldn't be the first. We ask for a reversal and the dismissal of their claims. We thank the court. All right, sir. Thank you.